ANDREW L. PACKARD (State Bar No. 168690)
LAURIE A. MIKKELSEN (State Bar No. 260313)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com
          Laurie@packardlawoffices.com

Attorneys for Plaintiff
California Sportfishing Protection Alliance

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE, a non-profit
corporation;

        Plaintiff,

    vs.

SANTA ROSA STAINLESS STEEL
FABRICATORS, INC., a California
corporation;

        Defendant.

Case No. 2:13-cv-01415-RS

**STIPULATION TO DISMISS PLAINTIFF'S
CLAIMS WITH PREJUDICE; [PROPOSED]
ORDER GRANTING DISMISSAL WITH
PREJUDICE [FRCP 41(a)(2)]**

TO THE COURT:

Plaintiff California Sportfishing Protection Alliance ("PLAINTIFF" or "CSPA"), and Defendant Santa Rosa Stainless Steel Fabricators, Inc. ("SRSS" or "DEFENDANT"), parties in the above-captioned action, stipulate as follows:

**WHEREAS**, on or about January 25, 2013, CSPA provided DEFENDANT with a Notice of Violations and Intent to File Suit ("60-Day Notice Letter") under Section 505 of the Federal Water Pollution Control Act ("Act" or "Clean Water Act"), 33 U.S.C. § 1365;

**WHEREAS**, on March 29, 2013, CSPA filed its Complaint against DEFENDANT in this Court, *California Sportfishing Protection Alliance v. Santa Rosa Stainless Steel Fabricators, Inc.* (USDC, E.D. Cal., Case No. 2:13-cv-01415-RS) and said Complaint incorporated by reference all of the allegations contained in CSPA's 60-Day Notice Letter;

**WHEREAS**, CSPA and DEFENDANT, through their authorized representatives and without either adjudication of CSPA's claims or admission by DEFENDANT of any alleged violation or other wrongdoing, have chosen to resolve in full by way of settlement the allegations of CSPA as set forth in CSPA's 60-Day Notice Letter and Complaint, thereby avoiding the costs and uncertainties of further litigation. A copy of the Parties' proposed settlement agreement ("Settlement Agreement") entered into by and between CSPA and DEFENDANT is attached hereto as **Exhibit A** and incorporated by reference.

**WHEREAS**, CSPA submitted the Settlement Agreement via certified mail, return receipt requested, to the U.S. EPA and the U.S. Department of Justice ("the agencies") and the 45-day review period set forth at 40 C.F.R. § 135.5 has been completed without objection by the agencies.

**NOW THEREFORE, IT IS HEREBY STIPULATED** and agreed to by and between the Parties that CSPA's claims, as set forth in its 60-Day Notice Letter and Complaint, be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2). The Parties respectfully request an order from this Court dismissing such claims with prejudice. In accordance with Paragraph 20(b) of the Settlement Agreement, the Parties also request that this Court retain and have jurisdiction over the Parties through September 30, 2015, for the sole

1

2

3

purpose of resolving any disputes between the parties with respect to enforcement of any

provision of the Settlement Agreement.

4   Dated:  June 19, 2013                    LAW OFFICES OF ANDREW L. PACKARD

5

6                                           By:___/s/_____

7                                           Andrew L. Packard
                                            Attorneys for Plaintiff
8                                           CALIFORNIA SPORTFISHING PROTECTION
                                            ALLIANCE
9

10  Dated:  June 19, 2013                    DOWNEY BRAND LLP

11

12                                          By:_/s/_____
                                            Melissa A. Thorme
13                                          Attorneys for Defendant
                                            SANTA ROSA STAINLESS STEEL
14                                          FABRICTORS, INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## [~~PROPOSED~~] ORDER

Good cause appearing, and the Parties having stipulated and agreed,

IT IS HEREBY ORDERED that Plaintiff California Sportfishing Protection Alliance's

claims against Defendant Santa Rosa Stainless Steel Fabricators, Inc. as set forth in

CSPA's 60-Day Notice Letter and Complaint filed in Case No. 2:13-cv-01415-RS, are

hereby dismissed with prejudice, each side to bear their own attorney fees and costs, except

as provided for by the terms of the accompanying Settlement Agreement.

IT IS FURTHER ORDERED that the Court shall retain and have jurisdiction over the

Parties with respect to disputes arising under the Settlement Agreement attached to the

Parties' Stipulation to Dismiss as Exhibit A until September 30, 2015.

**IT IS SO ORDERED.**

Dated: _ 6/21/13 _____          _____

                                    United States District Court Judge

**EXHIBIT A**

ANDREW L. PACKARD (State Bar No. 168690)
EMILY J. BRAND (State Bar No. 267564)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com
            Emily@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation, | Case No. 13-cv-01415-DMR |
| Plaintiff, | |
| vs. | **SETTLEMENT  AGREEMENT** |
| SANTA ROSA STAINLESS FABRICATORS, INC., a California corporation; | (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |
| Defendant. | |

WHEREAS, Plaintiff California Sportfishing Protection Alliance (hereinafter "CSPA") is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California's waters;

WHEREAS, Defendant Santa Rosa Stainless Steel Fabricators, Inc. (hereinafter "SRSS" and "Defendant") owns an approximately 3-acre stainless steel tank manufacturing facility located at 1400 Airport Boulevard, in Santa Rosa, California (the "Facility");

WHEREAS, CSPA and Defendant collectively shall be referred to as the "Parties;"

WHEREAS, the Facility collects and discharges storm water from the Facility into the Sonoma County Municipal Separate Storm Sewer System ("MS4"), that flows to Windsor Creek, to

Mark West Creek, to the Russian River and ultimately into the coastal waters of the Pacific Ocean (a map of the Facility is attached hereto as **Exhibit A** and incorporated herein by reference);

**WHEREAS**, storm water discharges associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ (as amended by Water Quality Order 92-12 DWQ and 97-03-DWQ), issued pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. §1342(p) (hereinafter "General Permit");

**WHEREAS**, SRSS has been covered by the General Permit since at least July 20, 1993 under Waste Discharge Identification ("WDID") No. 1B49S0103.  SRSS filed an Amended Notice of Intent ("NOI") to be covered under the General Permit in 1998 under WDID No. l49S0l0344.

**WHEREAS**, on or about January 25, 2013, Plaintiff provided notice of Defendant's violations of the Act ("Notice Letter"), and of its intention to file suit against Defendant to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the U.S. Attorney General; the Executive Director of the State Board; the Executive Officer of the Regional Water Quality Control Board, North Coast Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A) (a true and correct copy of CSPA's Notice Letter is attached as **Exhibit B** and incorporated herein by reference);

**WHEREAS**, Defendant denies the occurrence of the violations alleged in the Notice Letter and maintains that SRSS has complied at all times with the provisions of the General Permit and the Clean Water Act or, alternatively, that there are no "ongoing and continuous" violations of the General Permit or the Act;

**WHEREAS**, the Parties agree that it is in their mutual interest to resolve the Clean Water Act matter as to all entities and persons named in the Notice Letter without litigation and enter into this Settlement Agreement ("Agreement");

**WHEREAS**, on March 29, 2013, CSPA filed a complaint ("Complaint") against Defendant in the United States District Court, Northern District of California, (this matter hereinafter referred to as "the Action");

1   **WHEREAS**, for purposes of this Agreement only, the Parties stipulate that venue is proper in

2   this Court, and that Defendant does not contest the exercise of jurisdiction by this Court to dismiss this

3   matter with prejudice under the terms of this Agreement;

4   **WHEREAS**, this Agreement shall be submitted to the United States Department of Justice for

5   the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c); and shall thereafter be submitted

6   for approval by the Court;

7   **WHEREAS,** at the time the Agreement is submitted for approval to the United States District

8   Court, CSPA shall submit a Notice of Settlement and inform the Court of the expected dismissal date;

9   **AND WHEREAS**, upon expiration of the statutory review period, the Parties shall file with

10  the Court a Stipulation and Order that shall provide that the Complaint and all claims therein shall be

11  dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2) and request that the

12  Court retain jurisdiction for the enforcement of this Agreement as provided herein (the date of entry of

13  the Order to dismiss shall be referred to herein as the "Court Approval Date").

14  **NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING**

15  **PARTIES AS FOLLOWS:**

16  **I.**   **COMMITMENTS OF DEFENDANT SRSS**

17  **1.**   **Compliance With General Permit & Clean Water Act.**  Throughout the term of

18  this Agreement, SRSS shall continue implementing all measures needed to operate the Facility in

19  compliance with the requirements of the General Permit and the Clean Water Act, subject to any

20  defenses available under the law.

21  **2.**   **Implementation of Specific Storm Water Best Management Practices.**  On or

22  before July 1, 2013, SRSS shall complete the implementation of the following storm water source

23  control measures/best management practices ("BMPs"):

24  (a)   *Inspect, Repair & Maintain All Currently Implemented Structural BMPs.*  SRSS

25  shall on a monthly basis during the Wet Season (October 1 through May 31) inspect, repair

26  and maintain all structural and non-structural BMPs currently implemented at the Facility, with

27  specific attention to sediment controls, such as fiber rolls and filter cloths, and any other

28  - 3 -

sediment capture and retention devices, and shall document all such inspections, repairs and maintenance in a log maintained in the SWPPP at the Facility;

(b)   *Tarping & Other Coverage of Exposed Materials.*  SRSS shall increase its current tarping practices, such that all metallic supplies, equipment, debris or other likely sources of pollutants are covered with properly secured tarps when not in use during the Wet Season;

(c)   *Hazardous Materials.*  SRSS shall store all hazardous materials at the Facility inside or on concrete pads with secondary containment to prevent releases;

(d)   *Run-on.*  SRSS shall consult with the County to discuss the approval, funding, and timing for construction of a berm across the gated area located in the Facility's southwest corner to prevent or minimize the volume of run-on coming from adjacent facilities;

(e)   *Sources of Petroleum Fluids.*  SRSS shall clean up and remove all old materials and equipment that are likely sources of petroleum fluids, including 55-gallon drums that are stored outside and lack concrete pads or secondary containment measures;

(f)   *Improved Sweeping Regime*.  SRSS shall sweep all paved impervious surfaces at the Facility twice a week during the Wet Season, recording all such sweeping in the Facility SWPPP; and,

(g)   *Rain Gauge*.  SRSS shall install and maintain a working rain gauge at the Facility and record daily rainfall on business days throughout the year.

3.   **Subsequent Implementation of Specific Storm Water Best Management Practices.**  In the event that SRSS's storm water samples exceed EPA benchmark values for the General Permit's Table D metals (i.e., zinc, iron or aluminum) during the 2013-2014 Wet Season, SRSS shall implement one of the following additional measures on or before September 1, 2014:

(a)   *Grassy Swale.*  SRSS shall construct a larger and more effective bioswale in the culvert prior to the Facility's discharge point to the MS4; or, at SRSS's discretion,

(b)   *Metal Absorption*.  SRSS shall install a metal absorption sponge-boom (such as MetalZorb by Cleanway) on the culvert at the discharge point to the MS4.

- 4 -

**4.     SWPPP Amendments/Additional BMPs.**  On or before July 1, 2013, SRSS shall formally amend the Facility SWPPP to incorporate all of the relevant requirements of this Agreement, and shall revise the Facility map attached hereto as **Exhibit A**.  These revisions shall reflect all then-current site conditions and practices, and identify potential Contaminants of Concern ("COC"), identify the location of all pervious and impervious areas, drain inlets, BMPs, and storm water flow vectors.  These revisions shall also provide for weekly visual monitoring and maintenance of *all* Facility collection and discharge points, and bi-annual storm water management training for all Facility employees.

**5.     Sampling Frequency.**  SRSS shall collect and analyze samples from four (4) storm events, as qualified in the General Permit[1] for sampling purposes, in each of the two Wet Seasons occurring during the term of this Agreement (2013-2014 and 2014-2015).  The storm water sample results from the Facility shall be compared with the values set forth in **Exhibit C**, attached hereto, and incorporated herein by reference.  If the results of any such samples exceed the parameter values set forth in **Exhibit C**, SRSS shall comply with the "Action Memorandum" requirements set forth below.  For the constituents in Exhibit C that are not required to be monitored under the General Permit, SRSS shall be permitted to terminate monitoring of a listed pollutant(s) for the duration of this Agreement at a particular discharge point if four storm water sample results in a row from that discharge point indicate that no samples tested above the accredited laboratory's reported method detection limit for that particular pollutant constituent.

**6.     Sampling Parameters.**  All samples shall be analyzed for each of the constituents listed in **Exhibit C** by a laboratory accredited by the State of California.  All samples collected from

---

[1]  "Qualifying Storm Events" under the General Permit are those events in which (i) the samples taken are preceded by at least three (3) working days during which no storm water discharges from the Facility have occurred; (ii) the samples are collected within the first hour that flow is observed at the Discharge Point being sampled; and (iii) the samples are collected during daylight operating hours. General Permit, Section B.5.b.  However, consistent with General Permit Section B.8.b., in the event that SRSS can demonstrate good cause as to why it was unable to collect samples of storm water discharges within the first hour of discharges occurring during an otherwise qualifying storm event, SRSS may collect storm water discharge samples as soon as practicable during an otherwise qualifying storm event occurring during daylight operating hours.

the Facility shall be delivered to the laboratory as soon as possible to ensure that sample "hold time" is not exceeded.  Sampling results shall be provided to CSPA within seven (7) business days of SRSS's receipt of the laboratory report from each sampling event pursuant to the Notice provisions below.

7.       **"Action Memorandum" Trigger; CSPA Review Of "Action Memorandum"; Meet-and-Confer.**  If any stormwater discharge sample from the Facility taken during the two (2) Wet Seasons referenced in Paragraph 5 above exceeds the evaluation levels set forth in **Exhibit C**, or if SRSS fails to collect and analyze samples from four (4) qualifying storm events, as qualified in the General Permit and this Agreement, then SRSS shall prepare a written statement discussing the exceedance(s) and/or failure to collect and analyze samples from four (4) qualifying storm events, the possible cause and/or source of the exceedance(s), and additional measures that will be taken to address and eliminate future exceedances and/or failure to collect samples ("Action Memorandum"). The Action Memorandum shall be provided to CSPA not later than July 15 following the conclusion of each Wet Season during the term of this Agreement.  Recognizing that a SWPPP is an ongoing iterative process meant to encourage innovative BMPs, such additional measures may include, but are not limited to, taking confirmation samples, further material improvements to the storm water collection and discharge system, changing the type and frequency of Facility sweeping, changing the type and extent of storm water filtration media or modifying other industrial activities or management practices at the Facility.  Such additional measures, to the extent feasible, shall be implemented immediately and in no event later than sixty (60) days after the due date of the Action Memorandum. Within seven (7) days of implementation, the Facility SWPPP shall be amended to include all additional BMP measures designated in the Action Memorandum.  CSPA may review and comment on an Action Memorandum and suggest any additional pollution prevention measures it believes are appropriate; however, CSPA's failure to do so shall not be deemed to constitute agreement with the proposals set forth in the Action Memorandum.  Upon request by CSPA, SRSS agrees to meet and confer in good faith (at the Facility, if requested by Plaintiff) regarding the contents and sufficiency of the Action Memorandum.

- 6 -

1    **8.       Inspections During The Term Of This Agreement.**  In addition to the site

2    inspection conducted as part of the settlement process and as part of any meet-and-confer process

3    concerning an Action Memorandum as set forth above, SRSS shall permit representatives of CSPA to

4    perform up to two (2) physical inspections of the Facility during the term of this Agreement.  These

5    inspections shall be performed by CSPA's counsel and consultants and may include sampling,

6    photographing, and/or videotaping and CSPA shall provide SRSS with a copy of all sample results,

7    photographs and/or video.  CSPA shall provide at least forty-eight (48) hours advance notice of such

8    physical inspection, except that SRSS shall have the right to deny access if circumstances would make

9    the inspection unduly burdensome and pose significant interference with business operations or any

10   party, or the safety of individuals.  In such case, SRSS shall specify at least three (3) dates within the

11   two (2) weeks thereafter upon which a physical inspection by CSPA may proceed.  SRSS shall not

12   make any alterations to Facility conditions during the period between receiving CSPA's initial forty-

13   eight (48) hour advance notice and the start of CSPA's inspection that SRSS would not otherwise have

14   made but for receiving notice of CSPA's request to conduct a physical inspection of the Facility,

15   excepting any actions taken in compliance with any applicable laws or regulations.  Nothing herein

16   shall be construed to prevent SRSS from continuing to implement any BMPs identified in the SWPPP

17   during the period prior to an inspection by CSPA or at any time.

18   **9.       SRSS Communications To/From Regional and State Water Boards.**  During the

19   term of this Agreement, SRSS shall provide CSPA with copies of all documents submitted to, or

20   received from, the Regional Water Board or the State Water Board concerning storm water discharges

21   from the Facility, including, but not limited to, all documents and reports submitted to the Regional

22   Water Board and/or State Water Board as required by the General Permit.  Such documents and

23   reports shall be provided to CSPA pursuant to the Notice provisions set forth below and

24   contemporaneously with SRSS's submission(s) to, or, receipt from, such agencies.

25   **10.      SWPPP Amendments.**  Pursuant to the Notice provisions set forth below, SRSS

26   shall provide CSPA with a copy of any amendments to the Facility SWPPP made during the term of

27   the Agreement within fourteen (14) days of such amendment.

28

## II.    MITIGATION, COMPLIANCE MONITORING AND FEES AND COSTS

11.     **Mitigation Payment In Lieu Of Civil Penalties.**  As mitigation for the violations alleged in CSPA's Complaint, Defendant agrees to pay the sum of $15,000 to the Rose Foundation for Communities and the Environment ("Rose Foundation") within seven (7) days after the Court Approval Date, and to make two additional payments to the Rose Foundation in the amount of $10,000 within six (6) and twelve (12) months of the Court Approval Date, for a total mitigation amount of $35,000.  These funds shall be remitted directly to the Rose Foundation, Attn: Tim Little, 6008 College Avenue, Suite 10, Oakland, CA 94618 and shall be used for projects to improve water quality in Windsor Creek, Mark West Creek, the Russian River or the coastal waters of California within 25 miles of the mouth of the Russian River.

12.     **Compliance Monitoring Funding.**  To defray CSPA's reasonable investigative, expert, consultant and attorneys' fees and costs associated with monitoring SRSS's compliance with this Agreement, Defendant agrees to contribute $4,000 for each of the two Wet Seasons covered by this Agreement ($8,000 for the full term the Agreement), to a compliance monitoring fund maintained by counsel for CSPA as described below.  Compliance monitoring activities may include, but shall not be limited to, site inspections, review of water quality sampling reports, review of annual reports, discussions with representatives of SRSS concerning the Action Memoranda referenced above, and potential changes to compliance requirements herein, preparation for and participation in meet-and-confer sessions, water quality sampling and analysis, and compliance-related activities.  Such payment shall be made payable to the "Law Offices of Andrew L. Packard Attorney Client Trust Account" with the first payment to remitted within six (6) months of the Court Approval Date and the second to be remitted within twelve (12) months of the Court Approval Date.

13.     **Fees & Costs.**  Defendant agrees to reimburse CSPA in the amount of $25,000 to defray CSPA's reasonable investigative, expert, consultant and attorneys' fees and costs, and all other costs incurred as a result of investigating the activities at the Facility, preparing the Notices, and negotiating a resolution of this action in the public interest.  Such payment shall be made payable to the "Law Offices of Andrew L. Packard Attorney Client Trust Account" and remitted to the firm

- 8 -

1    within seven (7) days after the Court Approval Date.

2    **III.    DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT AGREEMENT**

3         **14.**    With the exception of the timelines set forth above for addressing exceedances of

4    values specified on **Exhibit C** and Action Memoranda, if a dispute under this Agreement arises, or

5    either Party believes that a breach of this Agreement has occurred, the Parties shall meet and confer

6    within seven (7) days of receiving written notification from the other Party of a request for a meeting

7    to determine whether a breach has occurred and to develop a mutually agreed upon plan, including

8    implementation dates, to resolve the dispute.  If the Parties fail to meet and confer, or the meet-and-

9    confer does not resolve the issue, after at least seven (7) days have passed after the meet-and-confer

10   occurred or should have occurred, either Party shall be entitled to all rights and remedies under the

11   law, including filing a motion with the District Court of California, Northern District, which shall

12   retain jurisdiction over the Action for the limited purposes of enforcement of the terms of this

13   Agreement.  The Parties shall be entitled to seek fees and costs incurred in any such motion, and such

14   fees and costs shall be awarded, pursuant to the provisions set forth in the then-applicable federal

15   Clean Water Act and Rule 11 of the Federal Rules of Civil Procedure, and applicable case law

16   interpreting such provision.

17        **15.    CSPA's Waiver and Release.**  Upon the Court Approval Date of this Agreement,

18   CSPA, on its own behalf and on behalf of its members, subsidiaries, successors, assigns, directors,

19   officers, agents, attorneys, representatives, and employees, releases Defendant and its officers,

20   directors, employees, shareholders, parents, subsidiaries, and affiliates, and each of its predecessors,

21   successors and assigns, and each of their agents, attorneys, consultants, and other representatives (each

22   a "Released Defendant Party") from, and waives all claims which arise from or pertain to the Action,

23   including, without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions,

24   mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum

25   incurred or claimed or which could have been claimed in this Action, for the alleged failure of

26   Defendant to comply with the Clean Water Act at the Facility, up to the Court Approval Date.

27   //

28

**16.     Defendant's Waiver and Release.**  Defendant, on its own behalf and on behalf of any Released Defendant Party under its control, release CSPA (and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representative) from, and waives all claims which arise from or pertain to the Action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to the Action.

**17.     CSPA's Covenant Not to Sue**.  For the period beginning on the Court Approval Date of this Agreement and ending on the Termination Date of this Agreement, CSPA agrees that neither CSPA, its officers, executive staff, members of its governing board nor any organization under the control of CSPA, its officers, executive staff, or members of its governing board, will file any lawsuit against Defendant, or against the other entities or persons set forth in the Notice Letters, seeking relief for alleged violation of the Clean Water Act or violation of the General Permit.  CSPA further agrees that, beginning on the Court Approval Date of this Agreement and ending on the Termination Date of this Agreement, CSPA will not support other lawsuits, by providing financial assistance, personnel time or other affirmative actions, against Defendant, or against the other entities or persons set forth in the Notice Letters, that may be proposed by other groups or individuals who would rely upon the citizen suit provision to challenge Defendant's compliance with the Clean Water Act or the General Permit.

**18.**     The Parties acknowledge that they are familiar with section 1542 of the California Civil Code, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

While CSPA asserts that California Civil Code section 1542 applies to general releases only, and that the release in Paragraph 15 above is a limited release, the Parties hereby waive and relinquish any rights or benefits they may have under California Civil Code section 1542 with respect to any other

- 10 -

claims against each other arising from, or related to, the allegations and claims as set forth in the Notice Letter and/or the Complaint, up to and including the Court Approval Date of this Agreement.

19.    Within five (5) business days of the mutual execution of this Agreement, Plaintiff shall submit this Agreement to the United States Department of Justice ("DOJ") for the statutory 45-day agency review period set forth in 33 U.S.C. §1365(c) and submit a Notice of Settlement to the federal District Court.

20.    Within seven (7) days of the expiration of the agency review period, the Parties shall file with the Court a Stipulation and Order providing that:

a.    the Complaint and all claims therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2); and ,

b.    the Court shall retain and have jurisdiction over the Parties with respect to disputes arising under this Agreement.  Nothing in this Agreement shall be construed as a waiver of any Party's right to appeal from an order that arises from an action to enforce the terms of this Agreement.

IV.    **MISCELLANEOUS PROVISIONS**

21.    The Parties enter into this Agreement for the purpose of avoiding prolonged and costly litigation.  Nothing in this Agreement shall be construed as, and Defendant expressly does not intend to imply, an admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Agreement constitute or be construed as an admission by Defendant of any fact, finding, conclusion, issue of law, or violation of law.  However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Agreement.

22.    The Agreement shall be effective upon mutual execution by all Parties.  The Agreement shall terminate on the "Termination Date," which shall be September 30, 2015.

23.    The Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.  An executed copy of this Agreement shall be valid as an original.

24.    In the event that any one of the provisions of this Agreement is held by a court to be

1    unenforceable, the validity of the enforceable provisions shall not be adversely affected.

2        25.    The language in all parts of this Agreement, unless otherwise stated, shall be

3    construed according to its plain and ordinary meaning.  This Agreement shall be construed pursuant to

4    California law, without regarding to conflict of law principles.

5        26.    The undersigned are authorized to execute this Agreement on behalf of their

6    respective Parties and have read, understood and agreed to be bound by all of the terms and conditions

7    of this Agreement.

8        27.    All agreements, covenants, representations and warranties, express or implied, oral or

9    written, of the Parties concerning the subject matter of this Agreement are contained herein.  This

10    Agreement and its attachments are made for the sole benefit of the Parties, and no other person or

11    entity shall have any rights or remedies under or by reason of this Agreement, unless otherwise

12    expressly provided for therein.

13        28.    **Notices.**  Any notices or documents required or provided for by this Agreement or

14    related thereto that are to be provided to CSPA pursuant to this Agreement shall be hand-delivered or

15    sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by

16    electronic mail transmission to the email addresses listed below:

17        Bill Jennings, Executive Director
    California Sportfishing Protection Alliance
18        3536 Rainier Avenue
    Stockton, CA 95204
19        E-mail: DeltaKeep@me.com

20        With copies sent to:

21        Andrew L. Packard
    Law Offices of Andrew L. Packard
22        100 Petaluma Boulevard North, Suite 301
    Petaluma, CA 94952
23        Tel:  (707) 763-7227
    E-mail: Andrew@packardlawoffices.com

24

25    Any notices or documents required or provided for by this Agreement or related thereto that are to be

26    provided to Defendant pursuant to this Agreement shall be sent by U.S. Mail, postage prepaid, and

27    addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email

28

- 12 -

addresses listed below:

Mark Ferronato
Santa Rosa Stainless Steel Fabricators, Inc.
1400 Airport Blvd.
Santa Rosa, CA 95403
Tel:  (707) 544-7777
E-mail:  mark@srss.com

With copies sent to:

Melissa Thorme
DOWNEY BRAND
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Tel:  (916) 520-5376
Fax.: (916) 520-5776
E-mail: mthorme@downeybrand.com

Each Party shall promptly notify the other of any change in the above-listed contact information.

29.    Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

30.    No Party shall be considered to be in default in the performance of any of its

obligations when a failure to perform is due to a "Force Majeure."  A Force Majeure event is any

circumstances beyond the Party's control, including, without limitation, any act of God, war, fire,

earthquake, flood, and restraint by court order or public authority.  A Force Majeure event does not

include normal inclement weather, such as anything less than or equal to a 100 year/24-hour storm

event, or inability to pay.  Any Party seeking to rely upon this paragraph shall have the burden of

establishing that it could not reasonably have been expected to avoid, and which by exercise of due

diligence has been unable to overcome, the Force Majeure.

31.    If for any reason the Court should decline to approve this Agreement in the form

presented, the Parties shall use their best efforts to work together to modify the Agreement within

thirty (30) days so that it is acceptable to the Court.  If the Parties are unable to modify this Agreement

in a mutually acceptable manner, this Agreement shall become null and void.

32.    This Agreement shall be deemed to have been drafted equally by the Parties, and

shall not be interpreted for or against any Settling Party on the ground that any such party drafted it.

33.    This Agreement and the attachments contain all of the terms and conditions agreed

- 13 -

1 | upon by the Parties relating to the matters covered by the Agreement, and supersede any and all prior
2 | and contemporaneous agreements, negotiations, correspondence, understandings, and communications
3 | of the Parties, whether oral or written, respecting the matters covered by this Agreement. This
4 | Agreement may be amended or modified only by a writing signed by the Parties or their authorized
5 | representatives.

6 |     **34.**     Except in case of an emergency but subject to the regulatory authority of any
7 | applicable governmental authority, any breach of or default under this Agreement capable of being
8 | cured shall be deemed cured if, within five (5) days of first receiving notice of the alleged breach or
9 | default, or within such other period approved in writing by the Party making such allegation, which
10 | approval shall not be unreasonably withheld, the party allegedly in breach or default has completed
11 | such cure or, if the breach or default can be cured but is not capable of being cured within such five
12 | (5) day period, has commenced and is diligently pursuing to completion such cure.

14 |     The Parties hereto enter into this Agreement and respectfully submit it to the Court for its
15 | approval and entry.

16 | Dated:  April  _20_  , 2013     California Sportfishing Protection Alliance

18 |     By: _____

19 |     Bill Jennings, Executive Director

21 | Dated:  April_____, 2013     Santa Rosa Stainless Steel Fabricators, Inc.

23 |     By: _____

    Mark Ferronato

- 14 -

SETTLEMENT AGREEMENT

1  upon by the Parties relating to the matters covered by the Agreement, and supersede any and all prior

2  and contemporaneous agreements, negotiations, correspondence, understandings, and communications

3  of the Parties, whether oral or written, respecting the matters covered by this Agreement. This

4  Agreement may be amended or modified only by a writing signed by the Parties or their authorized

5  representatives.

6      **34.**      Except in case of an emergency but subject to the regulatory authority of any

7  applicable governmental authority, any breach of or default under this Agreement capable of being

8  cured shall be deemed cured if, within five (5) days of first receiving notice of the alleged breach or

9  default, or within such other period approved in writing by the Party making such allegation, which

10 approval shall not be unreasonably withheld, the party allegedly in breach or default has completed

11 such cure or, if the breach or default can be cured but is not capable of being cured within such five

12 (5) day period, has commenced and is diligently pursuing to completion such cure.

13

14     The Parties hereto enter into this Agreement and respectfully submit it to the Court for its

15 approval and entry.

16 Dated: April_____, 2013      California Sportfishing Protection Alliance

17

18                 By:   _____

19                       Bill Jennings, Executive Director

20 Dated: April 2 0_____, 2013     Santa Rosa Stainless Steel Fabricators, Inc.

21

22                 By:   _____

23                       Mark Ferronato

24

25

26

27

28                           - 14 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A – Facility Site Map**

# ATTACHMENT B - SITE MAP

## BMP LEGEND

**Sediment Control**

SE-5 Fiber Roll
SE-7 Sweeping
SE-10 SD Inlet Protection

**Erosion and Run On Control**

EC-9 Earth Dike

**Non-Stormwater Control** [1]

NS-1 Water Conservation
NS-7 Potable Water/Irrigation
NS-8 Vehicle and Equipment Cleaning
NS-9 Vehicle and Equipment Fueling
NS-10 Vehicle and Equipment Maintenance

**Waste Management & Materials Pollution** [1]

WM-1 Materials Delivery and Storage
WM-2 Material Use
WM-4 Spill Prevention and Control
WM-5 Solid Waste Management
WM-10 Liquid Waste Management

1 - *Non-Stormwater and Waste Management BMPs will be practiced and used at various locations within the Facility and as required by the SWPPP.*

## FACILITY LEGEND

Impervious Surface
Gravel Surface
Concrete Curb
Open Drainage Ditch
Storm Water Flows
Area Drain                    AD No.
Junction Box                  JB No.
Channel Drain                 CD No.

N →

County of Sonoma's Storm Drain System
Storm Drain Outlet to

Sampling Point No. 3

MATERIAL STORAGE
MATERIAL STORAGE
TANK YARD
TANK YARD
STORAGE BINS
MATERIAL STORAGE

PAINT STORAGE

BASE BUILDING
PAINT ROOM
MECHANIC
FOOD PAD
ROOM
JB No. 3
JB No. 2

Sampling Point No. 2
(4" PVC pipe)

JB No. 1

MATERIAL STORAGE

WRAPPER PAD
TANK TESTING
CD No. 1
AD No. 4
ELECTRICAL
PARKING
FIRE HYDRANT
PARKING
AD No. 1
PARKING

WORK AREA
MANHOLE ROOM
WORK AREA
GLASS BEADER

SPOTWELDER
AIR COMPRESSOR
WORK AREA
WORK AREA
AD No. 3

MAIN SHOP

OFFICE
AD No. 2

MATERIAL STORAGE
MATERIAL STORAGE
PARKING

Concrete Culvert Inlet

Sampling Point No. 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT B – CWA Notice of Violation and Intent to Sue Letter**



January 25, 2013

VIA CERTIFIED MAIL
<u>RETURN RECEIPT REQUESTED</u>

Rod Ferronato, President
Nadine Lavell, Facility Operator Contact
Eddie Richards, Facility Contact
Santa Rosa Stainless Steel Fabricators, Inc.
1400 Airport Blvd.
Santa Rosa, CA 95403

Mark Ferronato, Agent for Service of Process and Facility Operator Contact
Santa Rosa Stainless Steel Fabricators, Inc.
1400 Airport Blvd.
Santa Rosa, CA 95403

**Re:    Notice of Violations and Intent to File Suit Under the Federal Water
        Pollution Control Act**

Dear Messrs. Ferronato, Ferronato and Richards and Ms. Lavell:

I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at the Santa Rosa Stainless Steel Fabricators, Inc. ("SRSS") facility, located at 1400 Airport Blvd. in Santa Rosa, California ("the Facility"). The WDID identification number for the Facility is 149I010344. CSPA is a non-profit public benefit corporation dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of the Mark West Creek, the Russian River, the Sacramento-San Joaquin River Delta and other California waters and the Pacific Ocean. This letter is being sent to you as the responsible owner, officer, or operator of the Facility. Unless otherwise noted, Santa Rosa Stainless Steel Fabricators, Inc., Mark Ferronato, Rod Ferronato, Eddie Richards and Nadine Lavell shall hereinafter be collectively referred to as SRSS.

This letter addresses SRSS's unlawful discharges of pollutants from the Facility

Notice of Violation and Intent To File Suit
January 25, 2013
Page 2 of 16

to the Mark West Creek, which flows into the Russian River and eventually out to the Pacific Ocean. This letter addresses the ongoing violations of the substantive and procedural requirements of the Clean Water Act and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 97-03-DWQ ("General Permit" or "General Industrial Storm Water Permit").

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("the EPA"), and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, Santa Rosa Stainless Steel Fabricators, Inc., Mark Ferronato, Rod Ferronato, Eddie Richards and Nadine Lavell are hereby placed on formal notice by CSPA that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, CSPA intends to file suit in federal court against Santa Rosa Stainless Steel Fabricators, Inc., Mark Ferronato, Rod Ferronato, Eddie Richards and Nadine Lavell under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General Permit. These violations are described more fully below.

## I.     Background.

SRSS owns and operates a stainless steel tank manufacturing facility located in Santa Rosa, California. The Facility falls under Standard Industrial Classification ("SIC") Code 3499 ("Fabricated Metal Products, Not Elsewhere Classified"). The Facility is primarily used to handle, store, manufacture and transport manufactured stainless steel tanks and tank parts. Other activities at the Facility include the use and storage of heavy machinery and motorized vehicles, including trucks used to haul materials to, from and within the Facility.

SRSS discharges storm water from its approximately 4-acre Facility through at least one (1) discharge point into the Mark West Creek, which flows into the Russian River and eventually out to the Pacific Ocean. The Delta and its tributaries are waters of the United States within the meaning of the Clean Water Act.

The North Coast Regional Water Quality Control Board ("Regional Board" or "Board") has established water quality standards for the Russian River in the "Water Quality Control Plan for the North Coast Region," generally referred to as the Basin Plan. The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life." For the

Notice of Violation and Intent To File Suit
January 25, 2013
Page 3 of 16

Russian River, the Basin Plan establishes standards for several parameters.  The Basin
Plan states that "water designated for use as domestic or municipal supply (MUN) shall
not contain concentrations of chemical constituents in excess of the limits . . . listed in
Table 3-2 of this Plan," which lists lead in excess of 0.05 mg/L.  *Id.* at 3-5.00.  The Basin
Plan also provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5."
*Id.* at 3-4.00.  The Basin Plan also prohibits the discharges of oil and grease, stating that
"[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that
result in a visible film or coating on the surface of the water or on objects in the water, or
otherwise adversely affect beneficial uses."  *Id.* at 3-3.00.

The Basin Plan also provides that water designated for use as domestic or
municipal supply (MUN) shall not contain concentrations of chemical constituents in
excess of the maximum contaminant levels (MCLs).  *Id.* at 3-11.00.  The EPA has issued
a recommended water quality criterion for aluminum for freshwater aquatic life
protection of 0.087 mg/L.  EPA has established a secondary MCL, consumer acceptance
limit for aluminum of 0.05 mg/L to 0.2 mg/L.  EPA has established a secondary MCL,
consumer acceptance limit for zinc of 5.0 mg/L.  EPA has established a primary MCL,
consumer acceptance limit for the following: chromium – 0.1 mg/L; copper – 1.3 mg/L;
and lead – 0.0 (zero) mg/L.  *See* http://www.epa.gov/safewater/ mcl.html.  The California
Department of Health Services has also established the following MCL, consumer
acceptance levels: aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); chromium –
0.5 mg/L (primary); copper – 1.0 mg/L (secondary); iron – 0.3 mg/L; and zinc – 5.0
mg/L.  *See* California Code of Regulations, title 22, §§ 64431, 64449.

EPA has also issued numeric receiving water limits for certain toxic pollutants in
California surface waters, commonly known as the California Toxics Rule ("CTR").  40
CFR § 131**.**38**.**  The CTR establishes the following numeric limits for freshwater surface
waters:  arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L (continuous
concentration); chromium (III) – 0.550 mg/L (maximum concentration) and 0.180 mg/L
(continuous concentration); copper – 0.013 mg/L (maximum concentration) and 0.009
mg/L (continuous concentration); lead – 0.065 mg/L (maximum concentration) and
0.0025 mg/L (continuous concentration).

The Regional Board has also identified waters of the Mark West Creek and
Russian River as failing to meet water quality standards for sedimentation/siltation and
temperature.  *See*
http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml.
Discharges of listed pollutants into an impaired surface water may be deemed a
"contribution" to the exceedance of CTR, a water quality standard, and may indicate a
failure on the part of a discharger to implement adequate storm water pollution control
measures.  *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918
(9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL
2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (finding that a discharger covered by the
General Industrial Storm Water Permit was "subject to effluent limitation as to certain
pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

The General Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants likely discharged by SRSS: aluminum – 0.75 mg/L; iron – 1.0 mg/L; total suspended solids – 100.0 mg/L; nitrate + nitrite 0.68 mg/L; and zinc – 0.117 mg/L. The State Water Quality Control Board has also proposed adding a benchmark level for specific conductance, 200 μmhos/cm. Additional EPA benchmark levels have been established for other parameters that CSPA believes are being discharged from the Facility, including but not limited to, arsenic – 0.16854 mg/L; lead 0.0816 mg/L; magnesium – 0.0636 mg/L; manganese – 1.0 mg/L; mercury – 0.0024 mg/L; and nickel 1.417 mg/L.

## II.    SRSS Is Violating the Act by Discharging Pollutants From the Facility to Waters of the United States.

Under the Act, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges. *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984). Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutants by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements. 33 U.S.C. § 1311(a). The duty to apply for a permit extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ." 40 C.F.R. § 122.30(a).

The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, a variety of metals, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6). A point source is defined as "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). An industrial facility that discharges pollutants into a navigable water is subject to regulation as a "point source" under the Clean Water Act. *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993). "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7). Navigable waters under the Act include man-made waterbodies and any tributaries or waters adjacent to other waters of the United States. *See Headwaters, Inc. v Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001).

The Mark West Creek, Russian River and its tributaries and the Pacific Ocean are waters of the United States. Accordingly, SRSS's discharges of storm water containing pollutants from the Facility are discharges to waters of the United States.

CSPA is informed and believes, and thereupon alleges, that SRSS has discharged and is discharging pollutants from the Facility to waters of the United States every day that there has been or will be any measurable flow of water from the Facility since January 25, 2008.  Each discharge on each separate day is a separate violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These unlawful discharges are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, SRSS is subject to penalties for violations of the Act since January 25, 2008.

## III.    Pollutant Discharges in Violation of the NPDES Permit.

SRSS has violated and continues to violate the terms and conditions of the General Permit.  Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit such as the General Permit.  33 U.S.C. § 1342.  The General Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Conventional pollutants are TSS, Oil & Grease ("O&G"), pH, biochemical oxygen demand ("BOD"), and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id.*; 40 C.F.R. § 401.15.

Further, Discharge Prohibition A(1) of the General Permit provides:  "Except as allowed in Special Conditions (D.1.) of this General Permit, materials other than storm water (non-storm water discharges) that discharge either directly or indirectly to waters of the United States are prohibited.  Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."  Special Conditions D(1) of the General Permit sets forth the conditions that must be met for any discharge of non-storm water to constitute an authorized non-storm water discharge.

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Notice of Violation and Intent To File Suit
January 25, 2013
Page 6 of 16

Based on its review of available public documents, CSPA is informed and believes: (1) that SRSS continues to discharge pollutants in excess of benchmarks, (2) the SRSS continues to fail to sample for parameters required by the General Permit, and (3) that SRSS has failed to implement BMPs adequate to bring its discharge of these and other pollutants in compliance with the General Permit. SRSS's ongoing violations are discussed further below.

### A.      SRSS Has Discharged Storm Water Containing Pollutants in Violation of the Permit.

SRSS has discharged and continues to discharge storm water with unacceptable levels of Total Suspended Solids (TSS) in violation of the General Permit. These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto as Attachment A. SRSS's Annual Reports and Sampling and Analysis Results confirm discharges of materials other than storm water and specific pollutants in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit:

### 1.      Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentration in Excess of Applicable EPA Benchmark Value.

| Date | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------|---------------------------|-----------------|
| 10/3/2011 | TSS | 300 mg/L | 100 mg/L |
| 3/12/2010 | TSS | 120 mg/L | 100 mg/L |

CSPA's investigation, including its review of SRSS's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's benchmark value for Total Suspended Solids (TSS) indicates that SRSS has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids (TSS) and other pollutants, in violation of Effluent Limitation B(3) of the General Permit. SRSS was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations. Thus, SRSS is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

CSPA is informed and believes that SRSS has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least January 25, 2008.  CSPA alleges that such violations also have occurred and will occur on other rain dates, including during every single significant rain event that has occurred since January 25, 2008, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit.  Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that SRSS has discharged storm water containing impermissible levels of Total Suspended Solids (TSS) and other unmonitored pollutants (e.g. iron, aluminum, nitrate + nitrite, and zinc) in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing.  Each discharge of storm water containing any pollutants from the Facility without the implementation of BAT/BCT constitutes a separate violation of the General Permit and the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, SRSS is subject to penalties for violations of the General Permit and the Act since January 25, 2008.

**B.      SRSS Has Failed to Implement an Adequate Monitoring & Reporting Plan.**

Section B of the General Industrial Storm Water Permit requires that dischargers develop and implement an adequate Monitoring and Reporting Plan by no later than October 1, 1992 or the start of operations.  Sections B(3), B(4) and B(7) require that dischargers conduct regularly scheduled visual observations of non-storm water and storm water discharges from the Facility and to record and report such observations to the Regional Board.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled."  Section B(5)(c)(i) further requires that the samples shall be analyzed for total suspended solids, pH, specific conductance, and total organic carbon.  Oil and grease may be substituted for total organic carbon.  Section B(5)(c)(ii) of the General Permit further requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  Section B(10) of the General Permit provides that "facility operators shall explain how the facility's monitoring program will satisfy the monitoring program objectives of [General Permit] Section B.2."

Based on its investigation, CSPA is informed and believes that SRSS has failed to develop and implement an adequate Monitoring & Reporting Plan.  First, based on its review of publicly available documents, CSPA is informed and believes that for the past five Wet Seasons, SRSS has failed to analyze samples for the pollutants required by the General Permit Table D in the storm water discharged from the Facility.  Second, based on its review of publicly available documents, CSPA is informed and believes that SRSS

Notice of Violation and Intent To File Suit
January 25, 2013
Page 8 of 16

has failed to collect storm water samples during at least two qualifying storms events, as defined by the General Permit, during the past five Wet Seasons. Third, based on its review of publicly available documents, CSPA is informed and believes that SRSS has failed to conduct the monthly visual monitoring of storm water discharges and the quarterly visual observations of unauthorized non-storm water discharges required under the General Permit during the past five Wet Seasons. Fourth, based on its review of publicly available documents, CSPA is informed and believes that for the past five Wet Seasons, SRSS has failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility. Fifth and finally, based on its review of publicly available documents, CSPA is informed and believes that SRSS has failed to collect storm water samples from the first storm of the Wet Season that produced a discharge during scheduled Facility operating hours during the past five years. Each of these failures constitutes a separate and ongoing violation of the General Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, SRSS is subject to penalties for violations of the General Industrial Storm Water Permit and the Act since January 25, 2008. These violations are set forth in greater detail below:

> **1.     SRSS Has Failed to Analyze Storm Water Samples During the Last Five Wet Seasons For the General Permit Table D Required Pollutants.**

The General Permit Section B(5)(c) establishes sampling and analysis requirements. Section B(5)(c)(i) requires permit holders to sample for pH, Total Suspended Solids, Total Organic Carbon or Oil & Grease, and Specific Conductance. Further, Section B(5)(c)(ii) requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities." Finally, Section B(5)(c)(iii) requires permit holders to sample for "[o]ther analytical parameters as listed in Table D." This section establishes that "[t]hese parameters are dependent on the facility's standard industrial classification (SIC) code."

Table D requires facilities with SIC Code 3499 "Fabricated Metal Products, Not Elsewhere Classified" to sample for zinc, nitrate + nitrite, iron, and aluminum. As stated above, SRSS's SIC Code is 3499. Therefore, SRSS is required to sample for zinc, nitrate + nitrite, iron, and aluminum. As demonstrated by SRSS's annual reports filed for every Wet Season in the last five years (i.e., 2007-2008; 2008-2009; 2009-2010; 2010-2011; and 2011-2012 Wet Seasons), SRSS did not test for zinc, nitrate + nitrite, iron, and aluminum in any of the past five Wet Seasons. SRSS's failure to sample for zinc, nitrate + nitrite, iron, and aluminum constitutes separate and ongoing violations of the General Permit and the Act.

Notice of Violation and Intent To File Suit
January 25, 2013
Page 9 of 16

    **2.**       **SRSS Has Failed to Collect Storm Water Samples During at
Least Two Rain Events In Each of the Last Five Wet Seasons.**

       Based on its review of publicly available documents, CSPA is informed and
believes that SRSS has failed to collect storm water samples from all discharge points
during at least two qualifying rain events at the Facility during the past five years, as
required by the General Permit.  For example, CSPA notes that the Annual Report filed
by SRSS for the Facility for the 2010-2011 Wet Season SRSS failed to sample two storm
events.  Further, in the 2009-2010 Annual Report, SRSS reported that it analyzed samples
of storm water discharged during two qualifying storm events, when in fact it did not
sample from a single qualifying storm event that season.

       SRSS reported in every Wet Season that it sampled in the last five years (i.e.,
2007-2008; 2008-2009; 2009-2010; 2010-2011; and 2011-2012 Wet Seasons), that the
Facility sampled the first storm of the season, when in fact it did not sample the first
storm of the season during at least four of the last five Wet Seasons.  For example, SRSS
reported in its 2010-2011 Annual Report that it sampled the first storm of the Wet
Season, but SRSS's first sample is from February 24, 2011.  Based upon its review of
publicly available rainfall data, CSPA is informed and believes that the first storm of the
2010-2011 Wet Season occurred as early as Friday, November 19, 2010, when 0.18" of
rain fell on the Facility.  Further, SRSS reported in its 2009-2010 Annual Report that it
sampled the first storm of the Wet Season, but SRSS's first sample was taken on
November 20, 2009.  Based upon its review of publicly available rainfall data, CSPA is
informed and believes that the first storm of the 2009-2010 Wet Season occurred as early
as Tuesday, October 13, 2009, when 3.1" of rain fell on the Facility.  This failure to
adequately monitor storm water discharges constitutes separate and ongoing violations of
the General Permit and the Act.

    **3.**       **SRSS Has Failed to Collect Storm Water Samples
from Each Discharge Point During at Least Two Rain
Events In the Last Five Wet Seasons.**

       Based on its review of publicly available documents, CSPA is informed and
believes that SRSS has failed to collect storm water samples from all discharge points
during at least two qualifying rain events at the Facility during each of the past five Wet
Seasons.  For example, CSPA notes that the Annual Report filed by SRSS for the Facility
for the 2010-2011 Wet Season SRSS failed to sample two storm events.  Further, based
on its investigation, CSPA is informed and believes that storm water discharges from the
Facility at points other than the one sampling/discharge point currently designated by
SRSS.  This failure to adequately monitor storm water discharges constitutes separate and
ongoing violations of the General Permit and the Act.

    **4.**       **SRSS Has Failed to Conduct the Monthly Wet
Season Observations of Storm Water Discharges Required by
the General Permit.**

The General Permit requires dischargers to "visually observe storm water discharges from one storm event per month during the Wet Season (October 1 – May 30)." General Permit, Section B(4)(a). As evidenced by the lack of Facility personnel documenting their observation of qualified storm events on Form 4 Monthly Visual Observations contained in SRSS's annual reports for the last five Wet Seasons, CSPA is informed and believes that SRSS has failed to properly conduct this requirement of the General Permit.

Specifically, SRSS failed to conduct monthly visual observations of discharges from qualifying storm events for most months during any of the past five Wet Seasons. Instead, SRSS has either documented its visual observations of storm water that discharged during non-qualifying storm events or asserted that a qualifying storm never occurred at the Facility for most months during the entire Wet Season of each of the past five years (discussed further below). However, based on publicly available rainfall data, CSPA is informed and believes that there were many qualifying storm events during each of these Wet Seasons that SRSS could have observed. For example, SRSS reported in its 2011-2012 Annual Report that there were no discharges during business hours during the month of January 2012, when in fact, there was a qualifying storm event on January 19, 2012, during which it is likely that 0.91" of rain fell on the Facility. Further, SRSS reported in its 2010-2011 Annual Report that there were no discharges during the month of December 2010, when in fact, it rained 0.24" at the Facility on Tuesday, December 14, 2010. SRSS's failure to conduct this required monthly Wet Season visual monitoring extends back to at least January 25, 2008. SRSS's failure to conduct this required monthly Wet Season visual monitoring has caused and continues to cause multiple, separate and ongoing violations of the General Permit and the Act.

### 5.    SRSS Is Subject to Penalties for Its Failure to Implement an Adequate Monitoring & Reporting Plan Since January 25, 2008.

CSPA is informed and believes that publicly available documents demonstrate SRSS's consistent and ongoing failure to implement an adequate Monitoring Reporting Plan in violation of Section B of the General Permit. For example, while in its 2009-2010 Annual Report SRSS reported having collected samples of storm water discharged during two qualifying storm events. Based on publicly available rainfall data, CSPA is informed and believes that the storm event on March 12, 2010 could not possibly be a qualifying storm event because a qualifying storm event fell on the Facility three days before, on March 9, 2010, during which 0.22" of rain fell on the Facility. The likely qualifying storm event on March 9, 2010, likely invalidated the subsequent storm event three days later on March 12, 2010.

Additionally, SRSS is in violation of the General Permit's requirement that the testing method employed in laboratory analyses of pollutant concentrations present in storm water discharged from the Facility be "adequate to satisfy the objectives of the monitoring program." General Permit Section B.10.a.iii. The Regional Board has

Notice of Violation and Intent To File Suit
January 25, 2013
Page 11 of 16

determined appropriate tests and detection limits that should be applied when testing for pollutant parameters.  The laboratory employed by SRSS to analyze the storm water sample collected for both samples applied incorrect testing methods such as inappropriate tests and inappropriately high detection limits in every Annual Report filed for the last five Wet Seasons.  For Oil & Grease, SRSS used the inappropriate test method of 5520B, instead of the appropriate method EPA 1664A.  Further, for Oil & Grease, SRSS used an inappropriately high detection limit of 5.0 mg/L, instead of the appropriate detection level of 1.0 mg/L.  Finally, SRSS failed to disclose the detection level for every analysis, excluding Oil & Grease, in every Annual Report filed for the last five Wet Seasons.  Based on the sampling data reported, it is likely that SRSS used inappropriate testing analysis for all parameters it sampled over the last five years.

SRSS is in violation of the General Permit for failing to employ laboratory test methods and detection limits that are adequate to, among other things, "ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in this General Permit."  General Permit Section B.2.a. ("Monitoring Program Objectives").  Accordingly, consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, SRSS is subject to penalties for these violations of the General Permit and the Act since January 25, 2008.

### C.      SRSS Has Failed to Implement BAT and BCT.

Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  CSPA's investigation indicates that SRSS has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids (TSS)  and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

To meet the BAT/BCT requirement of the General Permit, SRSS must evaluate all pollutant sources at the Facility and implement the best structural and non-structural management practices economically achievable to reduce or prevent the discharge of pollutants from the Facility.  Based on the limited information available regarding the internal structure of the Facility, CSPA believes that at a minimum SRSS must improve its housekeeping practices, store materials that act as pollutant sources under cover or in contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters or treatment boxes), and/or prevent storm water discharge altogether.  SRSS has failed to adequately implement such measures.

SRSS was required to have implemented BAT and BCT by no later than October 1, 1992.  Therefore, SRSS has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every

day that it fails to implement BAT and BCT.  SRSS is subject to penalties for violations of the General Permit and the Act occurring since January 25, 2008.

> **D.     SRSS Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

Section A(1) and Provision E(2) of the General Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992.  Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to Water Quality Order No. 97-03-DWQ to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 9, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)).  The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)).  The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).  Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedance of water quality standards.

Notice of Violation and Intent To File Suit
January 25, 2013
Page 13 of 16

CSPA's investigation and review of publicly available documents regarding conditions at the Facility indicate that SRSS has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. SRSS has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Accordingly, SRSS has been in continuous violation of Section A(1) and Provision E(2) of the General Permit every day since October 1, 1992, and will continue to be in violation every day that it fails to develop and implement an effective SWPPP. SRSS is subject to penalties for violations of the Order and the Act occurring since January 25, 2008.

**E.      SRSS Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP. The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard. Receiving Water Limitation C(4)(a). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Provision E(6). Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, SRSS is discharging elevated levels of Total Suspended Solids (TSS) and other unmonitored pollutants that are causing or contributing to exceedances of applicable water quality standards. For each of these pollutant exceedances, SRSS was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, SRSS was aware of high levels of these pollutants prior to January 25, 2008. Likewise, SRSS has generally failed to file reports describing its noncompliance with the General Permit in violation of Section C(11)(d). Lastly, the SWPPP and accompanying BMPs do not appear to have been altered as a result of the annual evaluation required by Section A(9). SRSS has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Permit every day since January 25, 2008, and will continue to be in violation every day it fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs. SRSS is subject to penalties for violations of the General Permit and the Act occurring since January 25, 2008.

**F.    SRSS Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the General Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit.  *See also* General Permit, Sections C(9) and (10) and B(14).

CSPA's investigation indicates that SRSS has submitted incomplete Annual Reports and purported to comply with the General Permit despite significant noncompliance at the Facility.  For example, SRSS reported in every Annual Report filed for the past five Wet Seasons (i.e., 2007-2008; 2008-2009; 2009-2010; 2010-2011; and 2011-2012) that it observed the first storm of every Wet Season.  However, as discussed above, based on CSPA's review of publicly available rainfall data, CSPA believes this cannot possibly be true.

Further, SRSS failed to comply with the monthly visual observations of storm water discharges requirement for every single Annul Report filed for the Facility for each of the last five years.  In the last five Wet Seasons, SRSS rarely made more than two monthly visual observations of storm water discharges, out of the eight month Wet Season.  In the 2011-2012 Annual Report, SRSS observed only one storm event, the same event that it sampled, and failed to observe discharge for any of the other seven months in the 2011-2012 Wet Season.  However, based on publicly available rainfall data, CSPA is informed and believes that storm events produced discharge at the Facility in most, if not every month of the 2011-2012 Wet Season.  Further, that it is likely that at least some of these storms fell during business hours.  Further, SRSS observed only one storm event during the 2010-2011 Wet Season, reporting no discharge from rain events during business hours during any month except February.  However, based on publicly available rainfall data, CSPA is informed and believes that this cannot possibly be true. For example, CSPA is informed and believes that there were at least two qualifying storm events that fell on the Facility in December 2010, including, but not necessarily limited to, Thursday, December 2, 2010, on which date it rained 0.2" and on Tuesday, December 14, 2010, on which date it rained 0.24."

These are only a few examples of how SRSS has failed to file completely true and accurate reports.  As indicated above, SRSS has failed to comply with the Permit and the Act consistently for at least the past five years; therefore, SRSS has violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time SRSS submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the past years. SRSS's failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act.  SRSS is subject to penalties for violations of Section (C) of the General Permit and the Act occurring since January 25, 2008.

Notice of Violation and Intent To File Suit
January 25, 2013
Page 15 of 16

**IV.    Persons Responsible for the Violations.**

CSPA puts Santa Rosa Stainless Steel Fabricators, Inc., Mark Ferronato, Rod Ferronato, Eddie Richards and Nadine Lavell under on notice that they are the persons responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Santa Rosa Stainless Steel Fabricators, Inc., Mark Ferronato, Rod Ferronato, Eddie Richards and Nadine Lavell on notice that it intends to include those persons in this action.

**V.    Name and Address of Noticing Party.**

Our name, address and telephone number is as follows:  California Sportfishing Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067.

**VI.    Counsel.**

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard                          Tel. (707) 763-7227
Erik M. Roper                                Fax. (707) 763-9227
Emily J. Brand                               Email:
Law Offices of Andrew L. Packard            Andrew@PackardLawOffices.com
100 Petaluma Boulevard, Suite 301           Erik@PackardLawOffices.com
Petaluma, CA 94952                          Emily@PackardLawOffices.com

**VII.    Penalties.**

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act Santa Rosa Stainless Steel Fabricators, Inc., Mark Ferronato, Rod Ferronato, Eddie Richards and Nadine Lavell to a penalty of up to $32,500 per day per violation for all violations occurring after March 15, 2004, and $37,500 per day per violation for all violations occurring after January 12, 2009, during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

Notice of Violation and Intent To File Suit
January 25, 2013
Page 16 of 16


CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Santa Rosa Stainless Steel Fabricators, Inc., Mark Ferronato, Rod Ferronato, Eddie Richards and Nadine Lavell and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.


Sincerely,


Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## **SERVICE LIST**

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Dorothy R. Rice, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Matthias St. John, Executive Officer
Regional Water Quality Control Board
North Coast Region
5550 Skylane Blvd., Ste. A
Santa Rosa, CA 95403-1072

**ATTACHMENT A**
**Notice of Intent to File Suit, Santa Rosa Stainless Steel Fabricators, Inc. (Santa Rosa, CA)**
**Significant Rain Events,* January 25, 2008 – January 25, 2013**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Oct. | 09 | 2007 | Jan. | 23 | 2009 | Feb | 04 | 2010 | Dec. | 31 | 2010 |
| Oct. | 10 | 2007 | Feb. | 05 | 2009 | Feb | 06 | 2010 | Jan. | 01 | 2011 |
| Oct. | 12 | 2007 | Feb. | 06 | 2009 | Feb. | 08 | 2010 | Jan. | 02 | 2011 |
| Oct. | 16 | 2007 | Feb. | 08 | 2009 | Feb. | 11 | 2010 | Jan. | 13 | 2011 |
| Oct. | 17 | 2007 | Feb. | 10 | 2009 | Feb. | 12 | 2010 | Jan. | 29 | 2011 |
| Oct. | 19 | 2007 | Feb. | 11 | 2009 | Feb. | 23 | 2010 | Jan. | 30 | 2011 |
| Nov. | 10 | 2007 | Feb. | 13 | 2009 | Feb. | 24 | 2010 | Feb. | 14 | 2011 |
| Dec. | 03 | 2007 | Feb. | 14 | 2009 | Feb. | 26 | 2010 | Feb. | 15 | 2011 |
| Dec. | 04 | 2007 | Feb. | 15 | 2009 | Feb. | 27 | 2010 | Feb. | 16 | 2011 |
| Dec. | 06 | 2007 | Feb. | 16 | 2009 | Mar. | 02 | 2010 | Feb. | 17 | 2011 |
| Dec. | 07 | 2007 | Feb. | 17 | 2009 | Mar. | 03 | 2010 | Feb. | 18 | 2011 |
| Dec. | 16 | 2007 | Feb. | 22 | 2009 | Mar. | 09 | 2010 | Feb. | 24 | 2011 |
| Dec. | 17 | 2007 | Feb. | 23 | 2009 | Mar. | 12 | 2010 | Feb. | 25 | 2011 |
| Dec. | 18 | 2007 | Feb. | 25 | 2009 | Mar. | 24 | 2010 | Mar. | 01 | 2011 |
| Dec. | 20 | 2007 | Mar. | 01 | 2009 | Mar. | 29 | 2010 | Mar. | 02 | 2011 |
| Dec. | 27 | 2007 | Mar. | 02 | 2009 | Mar. | 30 | 2010 | Mar. | 05 | 2011 |
| Dec. | 28 | 2007 | Mar. | 03 | 2009 | Mar. | 31 | 2010 | Mar. | 06 | 2011 |
| Dec. | 31 | 2007 | Apr. | 07 | 2009 | April | 02 | 2010 | Mar. | 10 | 2011 |
| Jan. | 03 | 2008 | Apr. | 09 | 2009 | April | 04 | 2010 | Mar. | 13 | 2011 |
| Jan. | 04 | 2008 | May | 01 | 2009 | April | 11 | 2010 | Mar. | 15 | 2011 |
| Jan. | 05 | 2008 | May | 02 | 2009 | April | 12 | 2010 | Mar. | 16 | 2011 |
| Jan. | 06 | 2008 | May | 03 | 2009 | April | 19 | 2010 | Mar. | 18 | 2011 |
| Jan. | 07 | 2008 | May | 04 | 2009 | April | 20 | 2010 | Mar. | 19 | 2011 |
| Jan. | 08 | 2008 | Oct. | 13 | 2009 | April | 27 | 2010 | Mar. | 20 | 2011 |
| Jan. | 09 | 2008 | Oct. | 14 | 2009 | May | 10 | 2010 | Mar. | 22 | 2011 |
| Jan. | 10 | 2008 | Oct. | 15 | 2009 | May | 17 | 2010 | Mar. | 23 | 2011 |
| Jan. | 21 | 2008 | Oct. | 19 | 2009 | May | 25 | 2010 | Mar. | 24 | 2011 |
| Jan. | 24 | 2008 | Nov. | 05 | 2009 | Oct. | 17 | 2010 | Mar. | 25 | 2011 |
| Jan. | 25 | 2008 | Nov. | 06 | 2009 | Oct. | 23 | 2010 | Mar. | 26 | 2011 |
| Jan. | 26 | 2008 | Nov. | 17 | 2009 | Oct. | 24 | 2010 | Mar. | 27 | 2011 |
| Jan. | 27 | 2008 | Nov. | 20 | 2009 | Oct. | 25 | 2010 | Apr. | 20 | 2011 |
| Jan. | 31 | 2008 | Nov. | 22 | 2009 | Oct. | 28 | 2010 | Apr. | 25 | 2011 |
| Feb. | 01 | 2008 | Dec. | 10 | 2009 | Oct. | 29 | 2010 | May | 15 | 2011 |
| Feb. | 02 | 2008 | Dec. | 11 | 2009 | Nov. | 07 | 2010 | May | 16 | 2011 |
| Feb. | 22 | 2008 | Dec. | 12 | 2009 | Nov. | 09 | 2010 | May | 17 | 2011 |
| Feb. | 19 | 2008 | Dec. | 15 | 2009 | Nov. | 19 | 2010 | May | 25 | 2011 |
| Feb. | 21 | 2008 | Dec. | 21 | 2009 | Nov. | 20 | 2010 | May | 28 | 2011 |
| Feb. | 22 | 2008 | Dec. | 26 | 2009 | Nov. | 21 | 2010 | May | 31 | 2011 |
| Feb. | 23 | 2008 | Dec. | 27 | 2009 | Nov. | 22 | 2010 | Jun | 01 | 2011 |
| Feb. | 24 | 2008 | Dec. | 29 | 2009 | Nov. | 27 | 2010 | Jun | 04 | 2011 |
| Mar. | 28 | 2008 | Jan. | 01 | 2010 | Dec. | 02 | 2010 | Jun | 05 | 2011 |
| Apr. | 22 | 2008 | Jan. | 11 | 2010 | Dec. | 05 | 2010 | Jun | 28 | 2011 |
| Oct. | 03 | 2008 | Jan. | 12 | 2010 | Dec. | 06 | 2010 | Oct. | 03 | 2011 |
| Oct. | 31 | 2008 | Jan. | 16 | 2010 | Dec. | 08 | 2010 | Nov. | 09 | 2011 |
| Nov. | 01 | 2008 | Jan. | 17 | 2010 | Dec. | 14 | 2010 | Dec. | 04 | 2011 |
| Nov. | 03 | 2008 | Jan. | 18 | 2010 | Dec. | 17 | 2010 | Dec. | 06 | 2011 |
| Dec. | 14 | 2008 | Jan. | 19 | 2010 | Dec. | 18 | 2010 | Dec. | 07 | 2011 |
| Dec. | 15 | 2008 | Jan. | 20 | 2010 | Dec. | 19 | 2010 | Dec. | 15 | 2011 |
| Dec. | 18 | 2008 | Jan. | 21 | 2010 | Dec. | 20 | 2010 | Jan. | 19 | 2012 |
| Dec. | 19 | 2008 | Jan. | 22 | 2010 | Dec. | 21 | 2010 | Jan. | 20 | 2012 |
| Dec. | 21 | 2008 | Jan. | 23 | 2010 | Dec. | 22 | 2010 | Jan. | 21 | 2012 |
| Dec. | 23 | 2008 | Jan. | 24 | 2010 | Dec. | 25 | 2010 | Jan. | 22 | 2012 |
| Dec. | 24 | 2008 | Jan. | 25 | 2010 | Dec. | 26 | 2010 | Jan. | 23 | 2012 |
| Jan. | 02 | 2009 | Jan. | 29 | 2010 | Dec. | 28 | 2010 | Feb. | 07 | 2012 |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**ATTACHMENT A**
**Notice of Intent to File Suit, Santa Rosa Stainless Steel Fabricators, Inc. (Santa Rosa, CA)**
**Significant Rain Events,\* January 25, 2008 – January 25, 2013**

| | | |
|---|---|---|
| Feb. | 12 | 2012 |
| Feb. | 28 | 2012 |
| Feb. | 29 | 2012 |
| Mar. | 12 | 2012 |
| Mar. | 13 | 2012 |
| Mar. | 14 | 2012 |
| Mar. | 15 | 2012 |
| Mar. | 16 | 2012 |
| Mar. | 24 | 2012 |
| Mar. | 25 | 2012 |
| Mar. | 27 | 2012 |
| Mar. | 31 | 2012 |
| April | 10 | 2012 |
| April | 12 | 2012 |
| April | 13 | 2012 |
| May | 03 | 2012 |
| Oct. | 21 | 2012 |
| Oct. | 22 | 2012 |
| Oct. | 23 | 2012 |
| Oct. | 31 | 2012 |
| Nov. | 01 | 2012 |
| Nov. | 16 | 2012 |
| Nov. | 17 | 2012 |
| Nov. | 18 | 2012 |
| Nov. | 19 | 2012 |
| Nov. | 20 | 2012 |
| Nov. | 21 | 2012 |
| Nov. | 22 | 2012 |
| Nov. | 28 | 2012 |
| Nov. | 29 | 2012 |
| Nov. | 30 | 2012 |
| Dec. | 01 | 2012 |
| Dec. | 02 | 2012 |
| Dec. | 04 | 2012 |
| Dec. | 05 | 2012 |
| Dec. | 15 | 2012 |
| Dec. | 16 | 2012 |
| Dec. | 17 | 2012 |
| Dec. | 20 | 2012 |
| Dec. | 21 | 2012 |
| Dec. | 22 | 2012 |
| Dec. | 23 | 2012 |
| Dec. | 25 | 2012 |
| Jan. | 05 | 2013 |
| Jan. | 23 | 2013 |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**EXHIBIT C**

| Parameter | Value |
|---|---|
| Aluminum | 0.75 mg/L |
| Zinc | 0.117 mg/L |
| Nitrate + Nitrite | 0.68 mg/L |
| Iron | 1.0 mg/L |
| Copper | 0.0636 mg/L |
| Chromium | 0.10 mg/L |
| Arsenic | 0.16854 mg/L |
| pH | 6.0 – 9.0 s.u. |
| Total Suspended Solids | 100 mg/L |
| Specific Conductance | 200 mg/L (proposed) |
| Oil & Grease | 15 mg/L |

(H) = Hardness dependent
Assumptions:
Receiving water temperature -20 C
Receiving water pH -7.8
Receiving water hardness CaCO3 100 mg/L
Receiving water salinity 20 g/kg
Acute to Chronic Ratio (ACR) -10

In any compliance determination, it shall be SRSS's burden to establish that the assumptions set forth above should not apply, based on actual sample data as to temperature, pH, hardness, salinity or ACR in the sample(s) in question.

1312867.1

---

SETTLEMENT AGREEMENT